**TRICENTROL OIL TRADING, INC. and Tricentrol Overseas, Ltd., Petitioners,**

v.

**Margaret I. ANNESLEY and Gale H. Touchstone, Respondents.**

No. D–0420.

Supreme Court of Texas.

May 8, 1991.

Rehearing Overruled June 5, 1991.

---

Paul J. Dobrowski, Robert R. Burford, Mark E. Lowes, Eileen K. Wilson, Houston, for petitioners.

William H. Bruckner, Sylvia Davidow, Evelyn Jo Wilson, William H. White, Houston, for respondents.

PER CURIAM.

Tricentrol Oil Trading, Inc. (TOTI) and Tricentrol Overseas, Ltd. (TOSL), petitioners, filed suit against Margaret I. Annesley and Gale H. Touchstone, respondents, to recover two seats on the New York Mercantile Exchange (NYMEX). A jury returned a verdict for petitioners on all theories of recovery and awarded damages to petitioners for conversion, breach of fiduciary duty, breach of contract, punitive damages, and attorney's fees. In conformance with the jury verdict, the trial court decreed that TOTI was the legal owner and holder of all right, title and interest in the exchange seats in question. Respondents raised numerous points of error before the court of appeals. In an unpublished opinion, the court of appeals summarily reversed the judgment of the trial court and remanded the case to the trial court for further proceedings. Among other things, petitioners assert that the court of appeals violated Texas Rule of Appellate Procedure 90 by: 1) failing to address all controlling issues; and 2) sustaining respondents'

points of error without stating the reasons for its decisions. Petitioners also assert that the court of appeals erred in holding the release dispositive.

The record reveals that TOTI and its parent company, TOSL, were engaged in oil trading in the United States and the United Kingdom. In an effort to reduce its trading costs, TOTI, through its comptroller, purchased two NYMEX seats. There is evidence to the effect that a NYMEX rule bars corporations from owning seats on the exchange, but officers of the corporation can take the seats in their name and confer trading privileges on their corporation. At the time the seats were acquired, Touchstone was vice-president of TOTI. TOTI paid for the seats and placed them in Touchstone's name. Sometime later, TOTI suffered significant losses after Touchstone ascended to the presidency of the corporation. TOSL sold TOTI and the new owner terminated Touchstone. However, TOSL retained the responsibility to settle any claims that Touchstone may have had against TOTI or TOSL. A termination agreement was executed wherein Touchstone received $75,000 and all parties were released from any and all claims. Touchstone never asserted his claim to the seats prior to his termination. The seats were not mentioned during negotiations nor were they listed in the written termination agreement.

The pertinent part of the release provides:

> 4. *Mutual Obligations.* [TOSL] and Touchstone agree to release, acquit and discharge each other (including Tricentrol's parent, subsidiary and affiliated companies, past and present, including Tricentrol Oil Trading Inc., and their successors and assignees, or any company holding the majority of stock in such companies and their respective stockholders, directors, officers, employees and agents) from any and all claims they may have against each other including, but not limited to any claim for benefits, compensation, costs, damages, expenses, salary or wages; and from any and all causes of action, of any kind or character, whether now known or not known.

Two months after Touchstone was terminated, NYMEX canceled TOTI's trading privileges because Touchstone was no longer an officer of the corporation. TOTI approached Touchstone and requested that he transfer the seats to TOTI's newly designated representative. Touchstone refused claiming that the seats were his by virtue of an oral agreement with respondent Annesley, TOTI's former president prior to Touchstone's tenure. Touchstone claimed that Annesley gave him the seats as part of his compensation. TOTI sued and the jury rejected all of Touchstone's assertions.[1] In a summary opinion, the court of appeals held that the release language disposes of the case. We disagree.

When title to property is taken in the name of someone other than the person who advances the purchase price, a resulting trust is created in favor of the payor. *Nolana Dev. Ass'n v. Corsi,* 682 S.W.2d 246, 250 (Tex.1984); *Cohrs v. Scott,* 338 S.W.2d 127, 130 (Tex.1960). It is an "intent trust" employed when trust property had been used for a special purpose which has terminated or become frustrated so that the law implies a trust for the equitable owner of the property. *See* G. BOGERT, THE LAW OF TRUSTS & TRUSTEES § 451, at 225–26 (2d ed. 1991); *Uriarte v. Petro,* 606 S.W.2d 22, 24–25 (Tex.Civ.App.—Houston [1st Dist.] 1980, writ ref'd n.r.e.). The trustee of a resulting trust stands in a fiduciary relationship with the beneficiary insofar as the trust property is concerned. RESTATEMENT (SECOND) OF TRUSTS, Ch. 12 *Resulting Trusts: General Principles,* at 326 (1957).

The question presented is whether the global language of the release acted to terminate any claim TOTI had to the seats.

---

1. Among other things, the jury found that Touchstone converted the two NYMEX seats and that Annesley had breached her fiduciary duty to TOTI.

We hold it did not. Rather, the release is ineffective as to the trust property, i.e., the seats, because Touchstone, in his capacity as trustee, failed to make a full and frank disclosure of his claim to the seats.

Although a resulting trust does not carry with it all of the duties of a trustee acting under an express trust, such a trustee has a duty to hold and convey the property according to the beneficiary's demands. *Nolana Dev.*, 682 S.W.2d at 250. To give effect to the parties' intent a release will be construed in light of the facts and circumstances surrounding its execution. *Houston Oilers, Inc. v. Floyd*, 518 S.W.2d 836, 838 (Tex.Civ.App.—Houston [1st Dist.] 1975, writ ref'd n.r.e.).

During the negotiations, Touchstone did not make known his claim to the trust property adverse to the beneficiary. The release and the circumstances at the time of its execution disclose a desire to resolve disputes relating solely to employment issues. The termination agreement merely recites consideration of $75,000 for release of Touchstone's claims. Nowhere in the release is there any expression of intent to relinquish rights to trust property which the jury found to be worth $546,000. Therefore, as a matter of law, we hold that the release did not alter the trust relationship. In order for the release to have been operative for such a purpose, it would have to expressly state as much. *See* RESTATEMENT (SECOND) OF TRUSTS, Ch. 12 *Resulting Trusts: General Principles*, at 326 (1957).

For example, in *Groves v. Hanks*, 546 S.W.2d 638, 649 (Tex.Civ.App.—Corpus Christi 1976, writ ref'd n.r.e.), a principal-agent relationship was ended with a release of all claims similar to the one under present consideration. The successor to the agent's interests claimed that the release entitled her to money in a bank account listed under the agents name as agent, and used exclusively for agency purposes. After reviewing the evidence the court observed that the mutual release "concerns only claims, known or unknown, which [the principal and agent] had against the other 'growing out of or in any way incident to the relations of principal and agent heretofore existing between them,'" and rejected the assertions of the agent's successor of a right to the money in the account. *Id.* at 649.

As a trustee, Touchstone could only act at the direction of TOTI. He received no instructions from TOTI until it requested that he transfer the seats. At that point, it was his duty to carry out the beneficiary's desires. *See* RESTATEMENT (SECOND) OF TRUSTS, Ch. 12 *Resulting Trusts: General Principles*, at 325 (1957).

Since we hold that the release is not dispositive, there remain many significant issues requiring thorough appellate review. We therefore grant petitioners' application for writ of error and pursuant to Texas Rule of Appellate Procedure 170, without hearing oral argument, a majority of the court reverses the judgment of the court of appeals and remands this cause to that court for a reconsideration of this appeal in conformance with appellate rule 90.